J. McGuire, *v.* Union Fire and Marine Insurance Co. of New Zealand.

## SUPREME COURT—IN BANCO.

APRIL TERM—1881.

*Harris, C. J., Judd and McCully, J.J.*

JAMES McGUIRE, TRUSTEE, *vs.* THE UNION FIRE AND MARINE INSURANCE COMPANY OF NEW ZEALAND.

ON EXCEPTIONS.

A VESSEL WAS INSURED against total loss on a policy which expired June 6th, at midnight. In the afternoon of the 6th she was lying at her anchor with four or five feet of water in her, strained and leaking, but still afloat and her masts and rigging standing. The captain and crew left her that afternoon and stayed on shore all night. The next morning, June 7th, *after* the policy had expired, the captain and crew let go her chains and allowed her to come ashore to save cargo;

HELD, no actual total loss shown; and as she was not abandoned to the underwriters while the policy was in force, there was no constructive total loss.

The verdict being for plaintiff, new trial ordered.

Opinion of the Court by HARRIS, C. J.

The plaintiff's vessel, the Eugenia M. Briggs, was insured by the defendant company against total loss. By the terms of the policy, the risk expired June 6th at midnight, and the question for the jury is whether the vessel was lost totally previous to the risk.

"A loss of maritime property under insurance is either actual (that is to say real and absolute) or constructive." 2 Parsons' Marine Insurance, 68. The first question that arises is whether before midnight of the sixth day of June, there is any evidence to show that there was an actual loss of the vessel. Upon this point the protest signed by the captain,

mate and second mate and all the crew, at Huelo, Maui, on the 7th of June, is conclusive. By that exhibit it appears that they were bound to this place of Huelo from Honolulu, where they arrived May 31st, which was Monday, made fast by a line to the buoy and let go an anchor in thirteen fathoms of water. Whether they began to unload on the 1st day of June or not does not appear by the protest or by any evidence in the case. But on the second day of June they were discharging cargo, for the protest states that they were "much hindered in unloading by heavy sea and winds," and that on June 1st, the day before, at 11 o'clock P. M., the schooner had begun to drag the anchor and moorings, and they let go another anchor and held her. They continued to unload during the 3d, 4th and 5th of the month. The protest states "that the sea was heavy, the wind blowing in shore, so that it was impossible to get the vessel out," though it appears they still continued unloading. All the evidence is that the wind was a little to the north of northeast, which is the trade wind. The protest continues that they put all hands on the pumps, but could not free the vessel, and pumped all night (Saturday). On Sunday morning, June 6th, they attempted to heave up anchor and go to sea, but the chain parted, and they desisted from the undertaking. About 4 P. M. Sunday the crew went ashore because it was dangerous to life to remain. In this connection the mate (Ferrier) states that the captain did not want to leave, and asked the crew to stay as long as they could; the captain refused to go on shore before dark; the vessel was sinking and had four or five feet of water in her hold. All hands remained on the beach all night, and on Monday morning went on board and found the vessel full of water. Thus it will be seen that on the morning of the 7th the vessel was in the same place they had put her a week before; that no accident had happened to her so far, except that she was strained and leaking badly. The fact that she was afloat on Monday morning had demonstrated that she was not

sinking the night before; she was not only afloat and in the form of a vessel, but carrying her cargo, with her masts and rigging all standing. Thus it is certain that she was not an actual loss before midnight of the sixth of June. "There must be no rational hope, no practical possibility of recovering possession of the property, and prosecuting the adventure to its termination, for only when such hope and possibility have ceased is it an actual total loss." Parsons on Marine Insurance, Vol. 2, p. 69. As we have said before, the vessel was afloat and useful as a vessel Sunday night, and on Monday morning, after the insurance had expired, as the protest says, they "let go the chains and allowed her to go ashore *in order to save as much of the cargo as possible,* for the benefit of whom it may concern." Now, in setting the vessel ashore they may have been right, but the risk of the defendant company had terminated some eight hours before that. By no construction possible was there an actual and total loss of that vessel before the termination of the risk. There was not only no evidence before the jury that there was a total loss, but all the evidence offered shows that there was none.

It remains for us to consider whether there was any evidence before the jury to show that there was a constructive total loss. "Much the larger portion of losses which are total become so by abandonment, or at least require an abandonment that they may have the legal effect of a total loss." 2 Parsons on Marine Insurance, p. 107. "Where a vessel is abandoned it must be clear that the vessel could not have been brought into port at the time of the abandonment, and the burden of proof is on the owners to prove that fact, and if a substantial hope exists of getting her again, the loss is neither total in a strict sense or in any just sense." 2 Parsons' Marine Law, 335. "The questions which most frequently occur in relation to this matter are, whether the assured was under any necessity of abandoning in order to make his loss total; whether he had any right to do so; whether he exercised this right in the

proper time and way. *Id.,* 334. Abandonment, by marine law, means not merely leaving the ship for a time, but abandoning her to the underwriters, so that they may take possession of her and do with her as their interests may dictate. Now, there was not one word of testimony before the jury that, previous to 12 o'clock at night on Sunday, the captain ever abandoned the vessel to the underwriters. If he abandoned the ship, he must likewise have abandoned her cargo. The mate, in his testimony, says that the captain did not want to leave, but exhorted the crew to stay. And when they went ashore, they remained on the beach all night, and that, too, in a well-peopled country, as it is to be inferred in order to watch the property; and on the morning of the 7th the protest says that they repaired on board, let go the anchor chains and allowed her to come ashore—for what purpose does the captain say? "In order to save as much of the cargo as possible." The mate says that "on the morning of the 7th she was anchored and moored to the buoy, one anchor down; they cut the rope and unshackled the chain, so as to let her go ashore and save cargo." Surely this is absolute proof that the ship was neither an actual total loss, nor abandoned to the underwriters, at any time while the policy was in force; so as to become a constructive total loss.

It is said by the plaintiff in this action: "It is generally held to be discretionary with the Judge who tried the cause to grant or deny a motion for a new trial on the ground that the verdict was not sustained by the evidence; and that a refusal to grant such a motion is proper whenever 'there was evidence which it was proper to submit to the jury, and upon which it was equally competent to find a verdict for the plaintiff; of its weight as sufficient to sustain the verdict we do not and cannot judge.'" Per Chapman, J., Polley *vs.* Lennox Iron Works, 4 Allen, 383. So per Shaw, C. J., in Cunningham *vs.* Magown, 18 Pick., 15. "Where the question is purely matter of fact, where there is evidence for the minds of the

jury actually and fairly to weigh and balance, where presumptions are to be raised and inferences drawn, and the jury may be presumed fairly to have exercised their judgment, a Court will not feel at liberty to set a verdict aside."

This is all very true, but it is inapplicable, for in this case, as we have seen, there is no testimony whatever before the jury to show that there was an actual or constructive total loss of the vessel in question within the time in which the defendant company took the risk.

Exceptions sustained. New trial ordered.

A. S. Hartwell for plaintiff.

E. Preston for defendants.

Honolulu, May 16, 1881.